Technologies v. Kaharsky. Mr. Holmes. Fortunately, in this complicated case, a lot of the underlying facts are no longer an issue. This case involved a lot of issues relating to computer technology and things like that. Yes, thank you for relieving us of that. Yes. What we're down to are primarily issues that are either damages or issues relating to damages. I guess the starting point here is to emphasize that the plaintiff, as always, chose its theory of damages. It was their choice. We did not force them into it. There were theories of damages they could have pursued against Dr. Kaharsky in particular, which would have created a lot fewer problems. For example, they could have pursued a reasonable royalty theory, saying, here's what we can make, and here's what a reasonable valuation, what a reasonable royalty would be on that particular technology. They could have pursued a lost profits theory, saying, you took this and it caused us to lose profits. That would work under either one of these theories, because after all, even if you are, you know, even if we have the corporate issues that we'll come back to, you're always going to be liable for your own personal actions, even if you are a corporate employee or officer or director, you're always going to be, for example, responsible for your own fraud. So if they had a theory of damages, such as reasonable royalty or lost profits, that could be directly traceable to what Dr. Kaharsky did, we wouldn't have the issues that we have currently in this case. The problem, of course, is those kinds of measures of damages would be measured probably in the thousands of dollars or tens of thousands of dollars, and QuantLab wanted a measure of damages that got you to the millions or tens of millions, and thus they overreached for a couple of theories of damages that are not supportable. How much of this argument did you make to the jury? I did make, certainly made this argument. It sounds as if this is exactly the argument you made to the jury, with some effect, obviously. That's right. That part of it certainly is. We certainly did not argue the specific legal issues that are what we're now coming to. For example, is an avoided cost theory even attachable to Dr. Kaharsky personally? Dr. Kaharsky did not avoid any costs. He did not have a development system. That would have been SXP that would have avoided costs. Dr. Kaharsky in his personal capacity did not. He went on to his own private ventures. Why could the jury not consider avoided costs for those ventures? They could have, except for one problem here. Again, it goes to the proof, in that Mr. Braddock, their expert witness, had a specific model for how he was going to calculate this, and he based it all on SXP, and he testified as such. If they had had, for example, a theory that Singletick, his next company, avoided costs, that would have been a conceivable theory. Of course, we would run into the same intracorporate conspiracy theory issue that we would have with Singletick, because that was also an LLC, a Wisconsin LLC. Would Dr. Kaharsky be personally liable for the avoided costs of Singletick? That would be the same issue that we have with respect to SXP. But they didn't make that argument. The argument was, here's what SXP avoided, because they were able to point, for example, to what SXP actually did, the things that they went through. The same thing, of course, is true of the profits, which you couldn't apply to Singletick, because Singletick never actually started doing business. It didn't generate any profits. JUSTICE SCALIA. So look at the jury instructions on this, and particularly on the issue of conviction, they got on the spoliation, the instruction that the issue is resolved, that Dr. Kaharsky is responsible for the theft of these trade secrets. Does that help at all on the damages? And tell me why not, since that's your answer. MR. WARREN. Well, I mean, certainly if the damages had been something that legally would be applicable to him, for example, if they had a reasonable royalty theory based on the things Dr. Kaharsky personally did in his own capacity, did with these trade secrets, the spoliation instruction would be applicable. It would not be good for me at all. But instead, the damages theories are, for example, in this case, the profits of SXP. And the spoliation instruction does not somehow make Dr. Kaharsky the recipient of the profits. JUSTICE SCALIA. Well, but to what extent were the destroyed documents relevant to these other ventures, and therefore showing what the costs might have been was not possible? MR. WARREN. Again, that's an argument that was never made in the trial court by the plaintiff. Their damages theory was purely based on Mr. Braddock. And that was something I was on all along. And, you know, that one hearing before Judge Ellison where I said, let's be sure, these damages theories are in the four corners of Mr. Braddock's report. And that's what Judge Ellison said, and that's what Mr. Kaplan, who was the lead trial counsel for  JUSTICE KENNEDY. I'm sure they put bread on. That was their primary ship in their armada. But, I mean, they also heard evidence that Kaharsky bragged about making $150,000 a day. MR. WARREN. Well, right. That particular testimony that you're referring to, Mr. Braddock talked about, was the he was referring back to what he had done when he was at Quantlab, what Quantlab was making. And, in fact, Mr. Braddock used that testimony to bolster some of his own calculations about what Quantlab was doing. There's no evidence, no allegation in this case that Dr. Kaharsky was out there running some side business that was JUSTICE KENNEDY. But didn't he move on to those two other entities, though? MR. WARREN. I'm sorry? JUSTICE KENNEDY. Didn't he move on to two other entities after he left SXP? MR. WARREN. Well, he moved on to one. There was a second one. Let me clear that up. There was a reference to an entity called QuantPlus that immediately after he left SXP, that he and some of the other SXP people talked about forming a company called QuantPlus. You'll hear that referred to. But that entity never did anything. There's no evidence or come into being, obviously, because there was an FBI search that came along right then. The FBI came in and seized everything, and that pretty much shot that one. JUSTICE KENNEDY. Well, wasn't there evidence that they didn't actually seize everything, that they kept some of the material from Quantlab? MR. WARREN. Well, that was an allegation, yes. But, again, up to the time of the FBI search, they still would have had some of those materials in their possession. But, again, that particular entity, QuantPlus, never came into existence. The later entity, which was years later, was Singletik. And that was a separate company that was based in Wisconsin, which never actually came into being. Well, it came into being, but it never began business operations. So those are the two entities. Could he have made profits from those entities, for example? He could have. But, again, the damages theories, and I've moved from summary judgment, moved in limine, moved every different way I could on this, what was supposed to be within the four corners of Mr. Braddock's report. And there was no evidence from Mr. Braddock. There was no argument at the trial court that Dr. Kuharski made profits from anywhere else. JUSTICE KENNEDY. Let me ask you this. On the conspiracy case, though, if the jury believed that Kuharski conspired with SXP, why wouldn't those losses be the profits of SXP, then, then transfer over to Kuharski? MR. BERRY. Right. And that gets us right into the intracorporate conspiracy issue, which is, under Texas law, you can't conspire, there can be no conspiring conspiracy between an employee of a corporation or an LFC. JUSTICE GINSBURG. I thought they cited two or three Texas cases that say when the LLC is set up purposely as part of the conspiracy, you can't invoke that doctrine. MR. BERRY. No, the case, but they cite the case, and they claim it says that, and it doesn't. The case that Judge Ellison cited on that was the, I think I wrote it down, the Lamont case, which doesn't even involve corporations. It involved a situation where there were two, there were limited partnerships, and what they held as the principle of one limited partnership could conspire with the principle of the other limited partnership. I'm not sure what it has to do with anything. This idea has been tossed out, you're correct, Your Honor, that somehow that you conspire to form a corporation, but I've never seen any authority for that. We've dug around, we've challenged some of this, we've shown you the cases that under Texas law, there is no authority, period, that anybody has come forward with that you can pierce a corporate veil by saying that you conspired to form it. JUSTICE GINSBURG. Okay, so a bunch of drug dealers can get together and form an LLC and launder money through the LLC, and that's not attributable to them. Is that your idea? MR. BERRY. They would all be responsible for their own criminal actions, just as Dr. Kuharski is on his individual claim. You can go after him individually for his own, in this case, torts, if you can prove a theory of damages attributable to his own personal tort. But in this situation, when you have an operating business and you're trying to say that our damages are the profits of this business, especially after he left, none of those profits were generated until, you know, at earliest, nine months after he was gone from that company. To say that he's liable for that is an entirely different matter. JUSTICE GINSBURG. Well, what they're citing from the record, I mean, this is purely a factual challenge at this point, right? Not a legal challenge. MR. BERRY. Well, there are legal challenges, certainly. I'm not sure which one you mean. JUSTICE GINSBURG. Well, in other words, saying that the jury missed it, I'm not quite sure whether you're saying there is no evidence that Kuharski personally profited by avoidance of costs, or whether you're saying that the jury had two different theories, one of which was infirm, and therefore both of them fail. MR. BERRY. I think both things. JUSTICE GINSBURG. But I don't think you preserved your error on the one about two theories, right? MR. BERRY. Yes, I did. JUSTICE GINSBURG. Okay. Well, let's assume you did. But they say after he left SXP, Kuharski used Quantlab's trade secrets to entice investors into Quantplus, touting his proven trading strategy. He relied on Quantlab's trade secrets to advance the single tick venture. In one email, investors discussed with Kuharski his sharing of intellectual property from his past work. In another, he explained that the cost of a particular trading approach should be avoided because, quote, we tried doing it back in 2002 to 2005, and it did not work. That's all correct. However, how does that tie to damages? Because nothing ever actually happened. Because they never actually did form the venture. They never actually did avoid the cost. He did talk to them about what he'd done at Quantlab. JUSTICE GINSBURG. He thought he continued trading and making money even after he left SXP. He wasn't sitting there twiddling his thumbs, because otherwise you wouldn't object to the injunction. MR. BERRY. May I answer that? JUSTICE GINSBURG. Sure. MR. BERRY. Yeah. The answer, again, is the damages theories are defined in the four corners of that expert report, and there was no damages theory based on profits that Dr. Kuharski generated outside of SXP. JUSTICE GINSBURG. Okay. Mr. Mamoulakis. MR. MAMOULAKIS. Good morning, Your Honor. JUSTICE GINSBURG. Good morning. MR. MAMOULAKIS. I'm sorry. I don't know that. I'm from Wisconsin. I think you guys have a formal way I'm supposed to start this. JUSTICE GINSBURG. We are not you guys. MR. MAMOULAKIS. Oh, sorry. JUSTICE GINSBURG. We are never you guys. You can call us sir if you want to, but you guys is not the way we speak in court. You may start your argument. MR. MAMOULAKIS. Okay. My apologies. I did not — my two main arguments that I'm attempting to make today is that still to this day I have no idea what the trade secret was that my company was accused of using and taking. I didn't come from QuantLab. I'm not a computer code designer. And when their expert was brought up onto the stand, the expert was asked, okay, with this here, where's the trade secret? And he answered with, well, it's in the details. And he didn't have it. Other experts were presented that came up during the trial and gave general concepts of code or file names or different items, at which point in time I believe it was at some point my right to be able to see whether or not what they were accusing me of having either existed in the public domain or was somewhere that I'd be able to see whether or not it was actually attributable. JUSTICE KENNEDY. Let me ask you this. The judge presumed that you would be liable because you participated in destroying records. Is that correct? MR. WARREN. Yeah, I believe on the copyright. JUSTICE KENNEDY. Well, no, on the trade secret. He found that you destroyed some records that would have tended to prove liability against you, so he presumed liability against you. Is that right or not? MR. WARREN. Sure. And that's what I was trying to figure out. Assuming I am liable, what records did the judge find that you destroyed? Did that have anything to do with trade secrets? MR. WARREN. No. What he found that was destroyed was the portals that hook up to the mainframe. When we got our discovery request, they were asking for all the information and never asked for the portals. So the portals is just the front system that goes in, and when we were getting everything ready and cleaned up, we cleaned up the portals to wrap up everything to be transferred out, and that's what I was found on was basically the portal systems. So even if liability is assumed, and there's a trade secret that would have been on those portals, then I still have a right to request, okay, what is the trade secret that's not in the public domain that would have been on that portal? Because then I would have been able to make the argument at some point in time, even if you're assuming everything I had is truly there, you still have to show where is the trade secret that I would have destroyed on that portal. JUSTICE KENNEDY. Well, the Quantlab chief technical officer testified at length about the nature of the proprietary source code that was taken. You were the CEO of the company, weren't you? MR. WARREN. Yes, sir. JUSTICE KENNEDY. So he testified in detail about the nature of the secrets that were taken. MR. WARREN. No, Your Honor, what he actually testified about is he pointed to file names and file contacts, and so there was no detail at any point in time, because coming from that industry, I could tell it was physically impossible for me to have ever used anything that was a trade secret at Quantlabs, because I was at a complete structural disadvantage. I could have Quantlabs trade secrets, the secret code of what makes their trades work. If I attempted to place those trades, they have a $300 million massive computer system that can execute those well in front of me. So there's no way I could have made money on that, and I explained that also to the jury, which I think impacted on what the jury's final decision was at the end of the case. And so the problem was, when their other expert came up and was asked, is it here, and he was aware of their witness and their witness disagreeing with each other. And at some point in time, it's their responsibility to present to me, hi, this is what you took from us, so that I can at least go vet it out to see if it's somewhere in the public domain. I even provided my full code, and I handed it to their expert, and their expert on the witness stand. I said, do you have my full code? He said, yeah. I said, did you trade secrets in it? He goes, absolutely. I go, where? He says, I don't know. The jury also hooked you on the conspiracy count, and so if you conspired with people who knew about it, then you have their knowledge. I'm sorry? The jury... You were liable as a conspirator. Okay, I knew it was a misappropriation of trade secret. And you can conspire to misappropriate trade secrets. Okay. And so what I was trying to figure out, since I was not at Quantlab, is that even if I, if the theory is that... You don't have to be, you don't have to, I mean, maybe, maybe you are, you don't have to know what illegal drugs your conspirator is participating in, as long as you're taking part of the money from something, whether it's meth or marijuana at a particular time. It doesn't matter if you're conspiring to an end that is not allowed in the law. Absolutely. And at a certain point in time, wouldn't we have to identify it as meth or marijuana or something illegal in a trade secret case? Well, apparently it's identified to the satisfaction of the jury, and they're not even contesting that. They're not even challenging the stealing of trade secrets. You were the CEO of the company when Kuharski left your company. And that was my, and that's what I presented, is that those trade secrets never made it to what we did. All right. We have your argument. Thank you. Mr. McDonald. In Kuharski's opening brief, he says this case is really about damages, and we agree this appeal is really about damages, but we believe it is also about something else, which is a significant mischaracterization of what the question presented to the jury really was in an effort to wiggle out of the nature of joint and several liability under conspiracy law in Texas. The conspiracy at issue here was not a conspiracy to form SXP per se or the operation of SXP per se. The conspiracy question that was presented to the jury was, do you find for preponderance of the evidence that Mr. Kuharski participated in an unlawful conspiracy to misappropriate trade secrets of Quantlab, period, not in SXP, not out of SXP, and the evidence presented to the jury was of a big period of time, what we would call essentially a three-act play, the pre-SXP misappropriation and efforts around that, the during SXP misappropriation, and the post-SXP. But on Act III, with whom, I mean, the district judge, as you know better than I do, didn't allow the withdrawal instruction to go to the jury, with whom was he conspiring after he withdrew from SXP? He withdrew from SXP for a while, then he circles back and conspires with Godlewski. He takes Ping Ann with him whenever he leaves SXP as well. Let me put it a different way. If he, if the jury were given the question, did he withdraw from SXP? He resigned. Let me finish. It's a question and I'm mumbling it, but let me finish the question. If the jury were given the question, did he do enough to withdraw from SXP, after that fact, what is the conspiracy that he's involved with? After that fact, he conspires with Godlewski and Ping Ann to, with Ping Ann to form Quant Plus, and then ultimately with Godlewski to form Singletick. And he is using the financial information, which is all trade secret information, in order to solicit investors for both of those entities. Now, the argument was made, well, but it doesn't matter because it never got off the ground. No, there was still use of something that he did not pay to develop. There's no period of time you're saying the evidence would indicate he was not conspiring with someone. It's not just that the goal was still, I mean, you could have an individual goal to misappropriate trade secrets. You don't need to be conspiring with anybody. But you're saying after he withdrew from SXP, he was still conspiring with someone all the rest of the way, insofar as this case presented to the jury is concerned. There were both acts done in conspiracy with other persons and acts done individually, as well, in terms of use of the trade secrets. But he was in a conspiracy, the conspiracy that the jury had, the evidence that the jury had before them, throughout that whole 3-1 Act play time period. Now, the other significant mischaracterization that we're getting out of this argument is that Braddock's damages report was limited to just what SXP did. And that is true with regard to the lost profits section of what SXP's operations were. But if you look closely at the report itself, that is not how it's written relative to the cost of development side of the equation. The cost of development side of the equation, which is at paragraph 26 of his report, is a calculation that's a proxy, as he describes it, for the cost savings of the defendants generally. Now, he points to some testimony during trial where he tried to get him to say, okay, have you tried to carve this up by individual? And ultimately, Braddock says, no, because it was my understanding this was a conspiracy. The point of his testimony being, I wasn't trying to divide this up. The cost of development proxy is Quantlab's cost of development, period. Once the individual has the trade secret in their hand that it took $54 million to develop, that's the cost of development measure of damages that the jury has to work with. Now, it can determine from that. They cut that significantly, right? They did. They did, based upon what they would have evaluated. And while we disagree with how much they cut, we believe it's within the realm of reasonableness for the jury to have determined. We may have struck you this way. I expect it struck some of us. It seems to me there's almost no correlation between the evidence that your witnesses put on and what the jury accepted. But that's for juries to determine and not for us to reevaluate. But they seem to have decoupled themselves from your evidence. Well, like you say, I think the proper standard is we're not supposed to get into trying to go through the mathematics of what the jury did. But what the jury could have easily done from the evidence is said, okay, the standard here is not, as he's trying to portray it, looking in hindsight what did they actually profit from that use of the trade secret. If you look at what this Court says in Globe-Ranger, that's what you say, is it's not a hindsight vision. It's what did the thief think he was getting, what was the value of this to the thief, in particular with regard to the type of use he put it to. The jury could have looked at the uses that they put it to and said, well, the use they put it to was not the full range of what they could have gotten out of this. So we're going to reduce the amount of value to the defendant. Let me look at the 1.8 or whatever it is that the individual damage was to Dr. Kovarsky. Your brief makes several arguments on that, but one of them is it's a timing thing, that at some point of time he was working individually, at some point of time he was conspiring. But it seems to me your argument also is that the conspiracy started even before they left Kwantlab, and they were taking trade secrets and they had the plan to further this in various ways, not all of which may have been worked out. I'm not sure the evidence really can be broken down. I saw you shaking your head, but I wanted to finish the question yet. As pre-SXP is the individual and post is the conspiracy, correct me from your point of view. We believe it was totally within the realm of the jury's province here and inferences they could have made. Well, but that should be some evidence of when he was acting individually and got the benefit of avoiding his costs and whatever else. And if you look at the evidence of when he was acting individually, he's terminated on the 9th and he starts, or actually I think he's terminated a little earlier. Yeah, no, terminated on the 9th. On the 13th, like four days later, he's starting to access Model Engine 7.9 on his laptop and looking at it and repeatedly hacks then into Kwantlab's computers to get a number who's not one of the VPN code, who's not one of the conspirators in the issue that's presented to the jury, a guy named Andrew. At the beginning of this, the evidence we presented to the jury was he's collecting everything and he gets the model engine, the brain of the code. He gets the configuration files. He gets the technology side of the code. He then consolidates it, and I can give you record sites for all this, but it's really in Pathways Reports if you want to run through it. Consolidates all this along with essentially 47,000 files before he starts talking to Godlewski about let's try and pursue something together. That was all individual misappropriation. What's the evidence on when he first talked? Well, the evidence of the sort of first meeting of the minds in terms of when did they actually start putting something together that we're going to try and form a business is May 24th, what we call the wish list email that he sends, and that's at the record 16451. And that's where now he's actually sitting down and making a plan. And what the jury was clearly within his province to determine was, well, okay, that's where now he's actually starting to conspire. He's not doing this on his own anymore. This is not individual activity. Now he's starting to conspire with folks to do something to misappropriate it. And this is where some of the other defenses really break down to. If you look at what the conspiracy was from that frame of reference, from what the question was that was actually submitted to the jury, he didn't withdraw prior to any kind of unlawful act of objective being pursued or any, I forget what the exact phrase is, some of the cases used, but it's such an overt act in furtherance of the conspiracy. He had already started downloading stuff and stealing stuff and working with it and copying it and dropping it to a DMI device that's still missing today, and then ultimately hands that DMI device off to Godlewski later after the May 24th plan for him to burn EO62, which is what ultimately Omenchenko describes as the whole enchilada, and that is found at SXP by the FBI when they seize SXP's code. When was SXP formed? SXP was formed in July of 2007. So they get together. Godlewski's been talking to Mamelotis. What was the role of SXP? I mean, why did Kaharski need SXP? Well, they needed something to trade through. They needed an entity to trade through. So ultimately they were setting this up to be the entity to trade through and needed investors. Did they have the capital to trade, or did they need outside capital to do it? They needed outside capital to do it. That's why when you look at the restatements list of what's commercial use, improper use of the trade secret, one of the things it talks about is soliciting customers. Here it's a little different. It's soliciting investors, but it's still use. They're using the financial performance information and the financial requirements information of Quantlab that they took on the Alphanova file that was stolen, which was years of performance information and financials about Quantlab in order to determine what they need to run this strategy that they'd stolen from Quantlab and to get investors into it because you're trading money. Without money, you can't get out of the gate. You heard opposing counsel say your cases on intracorporate conspiracies are not what they purport to be. Why don't you give me your best case and tell me what it holds? Yes. The intracorporate conspiracy, first of all, the logic of it doesn't hold up, because for exactly the reason that Judge Jones pointed out. It makes a lot of sense, but you have the law to support it. I think we would see a whole lot of paper corporations being filed if that was all there was to it. But we did actually find an opinion by Judge Boyle in a footnote, a reference to an Eastern District of Pennsylvania opinion where the court specifically said the intracorporate conspiracy rule does not apply when, as here, the defendants conspired prior to the formation of the corporation to form a corporation for the purpose of injuring the plaintiff. That's C. Albert Sodder Company v. Richard, 368 F. Sup. 501. So it took us a while to dig this out of a footnote, but we found it. Are there authorities to the contrary on this specific point? Not on this specific point. You can work together for a while and then decide let's get a name for ourselves and call it a corporation. Not on this specific point. And if you look at the Lamont decision that Judge Ellison referred to, it does say in there, in that case what had happened was the individuals were conspiring and then they formed two separate companies to operate that conspiracy separately. And the court said you can't form a conspiracy or form a corporation and avoid individual liability by doing it through the corporation. Now, true, there they weren't two individuals in one corporation. They were two individuals in two separate corporations, but the principle is the same. You can't use the corporate shield to avoid liability for conspiratorial acts, particularly not here when a bunch of those conspiratorial acts occurred before the thing was even in existence. So the argument that, oh, by the way, I'm part of SXP, so that absolves me of all liability for my conspiratorial acts, when the range of conspiratorial acts is both before and after the existence of SXP just simply doesn't hold up. How long did SXP operate before Kaharski withdrew? I want to say about six months to nine months, something in that range. And what was their earnings? What was the evidence under their earnings before he left? Well, it depends on whether or not you look at it as the point in time where he says he's leaving or the point in time where he actually is no longer an interest holder because he's gotten his capital back and gotten his code out of SXP. If it's the former, there isn't any because they really haven't started trading yet. If it's the latter, then there's about $4 million worth of profits that they had gained over that 2008 to 2009 time frame before he actually pulls out. Okay. What about after he left? What evidence of earnings is there, if any? I'm sorry, what? After Kaharski left, let's say the final date when you say he left, any earnings he made in his further ventures? Well, we don't know because the man destroyed computers at a rate that Judge Ellison said was the worst foliation he'd seen in 16 years. We really have no way to know what he was trading, making, doing after that because he wiped those computers and he wiped them in one case after the judge had issued an order saying turn this over, he goes in and runs a shred program across a bunch of them. That's what got him the ultimate liability sanction. I asked opposing counsel just how far we can go with that. It does seem to me obviously an extraordinarily serious violation of the court's orders, but can we get into speculation? Well, you have. It's not possible. Okay. So as a note of that, how far does, I mean, at least the jury was told you don't have to worry about liability here. We only need to worry about damages because of this correlation. How does it help you? What would you tell us, tell me in response to my question, is the benefit for you on this appeal of the ruling on spoliation? Any time you see in that brief there's no evidence of, that rings hollow when you destroy the evidence. But you said speculation is not available, so there's got to be something between no evidence and destroyed evidence. And what we do have evidence of, fortunately, because of the seizure by the FBI before he started, he couldn't destroy that stuff because they had grabbed it, is this whole big pattern of what he was doing. And we have his bragging that he had made $50 million. Now, they say, well, that was in reference to SXP, but that's not what the e-mail or the business plan edition says. It just talks about having made that much money before with Godlewski. And, in fact, if you look at when he says $50 million, it does make you wonder because the actual profits that Braddock identifies SXP as having made is 28 point something, not 50. When he said he was making up to $150,000 to $200,000 a day, was he talking about SXP or later ventures? I don't remember if he made a reference one way or another as to where he was making that money. I mean, what did you argue to the jury was the evidence that supported damages for that period? And the $150,000 a day is showing how much this trading strategy can make. That was, frankly, what the context of that evidence was coming in as. When he turns around and brags and says I've been making a whole bunch of money off of this with my buddy Godlewski here and doesn't identify who all it was from, and they say, well, that must have been SXP, now they're stepping into the province of the jury. Well, you're saying that you still have an avoided cost theory, even though he may not have earned any profit. And that is, I think, a really critical point because they keep missing this point that is made in Globe Ranger really strongly, which is we are not going to have the damages in a trade secret case limited to just what the actual profits are that the misappropriator makes or the actual cost that the misappropriator manages to achieve if he does it good, if he does it correctly. Instead, the issue is what he could have reasonably expected. Now, I'll give you the quote out of the court. And the reason for that is because the court says we're not going to essentially reward the defendant and punish the plaintiff for the fact that his gamble turned out to be a bad one if he steals a trade secret and he can't make money off of it or he can't really use it that well. So the issue is really what is almost like an opportunity cost thing is, you know, what's the value to him of what he took in terms of what he's going to use it for? And one of those measures as a proxy is the cost of developing it for the plaintiff in the first place. The jury is allowed to use that. And keeping in mind that the court recognizes this is an approximation only and approximations are allowed in trade secret cases and keeping in mind that the court has said repeatedly now that we have to have under Texas law a flexible and imaginative approach to this  Now, they quote the Southwestern opinion where the Texas Supreme Court did have an issue with the damages there, but the difference there is in the Southwestern opinion there was a very specific market amount that had been identified as the value of the trade secret and it wasn't being used. And they said, oh, no, when there is something very clearly specifically identified. Is that the overriding royalty case? I'm sorry? Is that the overriding royalty case and it could be specifically calculated as what the Supreme Court? Yeah, that was the Southwestern. I can't remember the second part of the site. Okay. He cites it in his brief for the position that it can't be so speculative. It needs to be more precise. But the point the court was making there was, well, we had a very specific market value identified here.  And, in fact, he references this reasonable royalty issue and argues all this stuff about confusion because of the reference, the way the jury charge was set up. And if you look in Braddock's report in terms of the reasonable royalty issue, he does identify it and describes why he's not applying it. He says it can't be applied here. So, really, the only thing that the jury had to apply was this development cost type theory. So, you know, we're really just talking about that as their starting benchmark. And the damages at issue were within that benchmark. Thank you, counsel. Thank you, sir. Mr. Holmes. May it please the Court. A couple of points I want to make. First of all, with respect to the avoided cost theory, I think it's important to remember that that has to be attached to some sort of real-world development. In other words, the mere fact that I go and steal a trade secret from somebody and put it in my, have it on my computer, have it sitting in my garage, whatever, that does not give rise to an avoided cost theory unless I actually develop something. That should be common sense. If I'm not avoiding any costs, then that's not going to work. Well, the plant lab put on evidence that took them $100 million or whatever it was to create their trading platform, and your fellow moves into the market and, you know, gets a little capital and starts competing. Even if he didn't, if that didn't transpire exactly as he had expected, it seems to me that he has avoided costs. But this argument is, I don't understand where your argument would go because at best it's to the amount of damages and not to the existence of damages. Actually, I think it goes to the existence. In this case, this is the first time, this litigation has been going on in one form or fashion for 10 years. This is the first time that I've heard in any of those 10 years that there's some suggestion that Dr. Kuharski was doing something prior to SXP. That's the first time I've heard that was, I think, today's oral argument. Well, it's in his brief, too. I've not seen it made that there's any indication, allegation in the case, or any evidence that he was actually developing anything. He had no money. The only development that's been shown, actual development, was SXP and Singletik. They were the companies. There's certainly, I've never heard this argument before that somehow he was off on his own developing something at any point in time. The argument I heard is he was off on his own stealing things. I'm sorry? The argument I heard this morning was he was off on his own stealing trade secrets, and then two or three months later gets in with a co-conspirator. So we'll have to listen to it again to be sure, but I'm not sure this is a brand new argument. Well, no, at that point, once he goes to SXP, I agree, that's always been the argument, that SXP. Mr. Momolakis was the money man. He was the guy with the capital. That's how they formed the company. But counsel said they started talking in May, and SXP eventually then came into fruition in July. So that's before SXP. Between May and July is before SXP. Right. They were talking, but they weren't doing anything. Well, trying to put it together is what he said. Right, put together the company. That's right. Put together the scheme, too. Right, but still, in order to actually avoid costs, you actually have to have a development system. You actually have to be doing something. You said that. What case says that? Well, I think that's Southwestern Energy, if nothing else. No, I tend to agree with their reading of it. But aside from that, go ahead. Well, I'm out of time, so thank you. All right, thank you. You want to ask him to go talk to Vic or not? We have another rebuttal still. I'm sorry. We have one more rebuttal. No, he used his time. Oh, you want to use your one minute? He just gave it back to us, I think. Thank you. All right, we'll be in recess until 9 o'clock tomorrow morning.